**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TROY COULSTON** <br><br> **v.** <br><br> **CITY OF PHILADELPHIA, et al.** | **CIVIL ACTION** <br><br> **NO. 23-4077** |

<u>**MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT**</u>

Baylson, J.                                                          **August 15, 2025**

Plaintiff Troy Coulston ("Coulston" or "Plaintiff") was wrongfully convicted 33 years ago for the murder of 19-year-old Michael Haynesworth. Lacking forensic evidence, the prosecution at his 1992 criminal trial relied on the testimony of two key witnesses—James White and Rashida Salaam—who both implicated Plaintiff as the shooter.[1] Plaintiff and his co-defendant, Christopher Williams, were convicted on January 22, 1992. Plaintiff's appeals and petitions for post-conviction relief between 1992 and 1999 were denied. Then, decades later, the newly formed Philadelphia District Attorney's Office's Conviction Integrity Unit ("CIU") reviewed his case.

The Philadelphia CIU since its re-formation in 2018 has had an important impact on working to remedy some of the gravest injustices in our criminal legal system. The CIU tasks prosecutors with reviewing old cases to identify persons who were wrongfully convicted and to take corrective action as quickly as possible. According to the Philadelphia CIU's published data, the CIU's work has resulted in the exonerations of over 50 wrongful convictions. <u>Philadelphia District Attorney's Office Public Data Dashboard</u>, https://data.philadao.com/Exonerations.html. There is much more work to be done, as more than 1,000 convictions await the CIU's review. <u>Id.</u>

---

[1] At the time of Haynesworth's death, White was 19 years old, and Salaam was only 13.

Prosecutors from the Philadelphia CIU conducted an extensive review of Coulston's and Williams' case file in the Haynesworth murder after determining that James White—the critical eyewitness for the prosecution—was not credible.[2]  The CIU concluded from its investigation that evidence that could have undermined White's credibility had it been available to the defense at the 1992 criminal trial was suppressed.  The CIU noted that James White provided many contradictory statements to police—statements inconsistent with other witness accounts and statements contradicting the forensic evidence—and that the additional suppressed inconsistent statements would have been important impeachment material.[3]  The CIU conceded that Coulston was wrongfully convicted.  The Philadelphia Court of Common Pleas vacated Coulston's sentence, ordered a new trial, and granted the Commonwealth's motion to *nolle pros* Coulston's charges. Coulston was ordered released on November 30, 2021.

The CIU's success in exonerating wrongfully incarcerated people and unearthing possible police and/or prosecutorial misconduct has resulted in many recent § 1983 civil rights cases in this Court.  Based on his own exoneration, Plaintiff brings this § 1983 action against the original detectives from the Philadelphia Police Department's Homicide Division ("Defendant Officers"), the prosecutor from his criminal trial ("ADA Desiderio" or "Desiderio"), and the City of Philadelphia (the "City"), alleging violations of his constitutional rights, including fabrication of evidence (Count I), malicious prosecution (Count II), deliberate suppression of exculpatory evidence (Count III), municipal liability (Count IV), and a supplemental state law claim of malicious prosecution (Count V).  At the heart of Plaintiff's claims is the CIU's determination—

---

[2] The Court is not aware of any § 1983 case Christopher Williams, who is now deceased, may have brought against the City or homicide detectives.

[3] The generic term "police" used throughout this Memorandum usually refers to homicide detectives.  Although homicide detectives are employed by the City of Philadelphia Police Department, they have specific responsibilities in investigating homicide cases.

and White's recent admission—that he was not truthful in his trial testimony. Plaintiff argues that the detectives and the prosecutor recklessly disregarded signs that James White and Rashida Salaam were not truthful and suppressed evidence of inconsistencies to build their case against Coulston.

The record is expansive and the filings voluminous. The Court has reviewed the record evidence and witness statements providing varying accounts of the Haynesworth murder. The Court acknowledges that the police were in the difficult position of trying to sort out the varying accounts of a homicide by the two teenage eyewitnesses, but that is no defense to violating Plaintiff's civil rights. The evidence of suppressed exculpatory material, as the CIU found, is concerning. While the Court must dismiss the individual defendants for the reasons provided below, on this record, there are genuine disputes of material fact that preclude the Court from dismissing the City based on credible evidence of a practice and custom of suppressing exculpatory evidence. This case will proceed to trial against the City.

## I.    UNDISPUTED MATERIAL FACTS

The following is a fair account of the material factual assertions at issue in this case, as taken from all parties' Statements of Fact and briefs as well as the deposition transcripts and discovery documents reviewed by the Court, many of which are not genuinely disputed.[4]  Where there are facts in dispute, the Court notes such below.

### A.    Police Discover Michael Haynesworth's Body

On November 21, 1989, police discovered the body of Michael Haynesworth in the rear passenger seat of a car parked in a secluded grassy area of Fairmount Park in Philadelphia. Def.

---

[4] The City and Defendant Officers (ECF 169), and former ADA Desiderio (ECF 159) each filed a Statement of Undisputed Facts, and Plaintiff filed a Statement of Additional Facts (ECF 177). The Court in its factual summary incorporates undisputed facts from all three statements and identifies those material facts which are in dispute.

Officers' Statement of Fact ("Def. Officers' SOF") (ECF 169), ¶¶ 7–8.  Haynesworth's body was found with multiple shotgun wounds, blindfolded with a brown necktie, and his hands and feet tied with a gray colored telephone wire.  Id.  Police observed tire tracks in front of Haynesworth's car that appeared to have been left by a different vehicle.  Id., ¶¶ 18–20; Pl.'s Statement of Additional Facts ("Pl. SOF") (ECF 177), ¶ 22.  The Medical Examiner made several key forensic findings in a written report on November 21, 1989:

- Haynesworth sustained multiple shotgun wounds to the head, a graze on his left hand, a shot to his left elbow, and a shot to his left leg;

- The blind-fold consisted of a brown and pink necktie and the ligatures around Haynesworth's ankles and wrists were sections of a gray telephone cord;

- Haynesworth's nose exhibited a "partial distortion by a shotgun wound to the left side face," his mouth and buccal mucosa were "markedly distorted by a shotgun wound to the face," and several of his natural teeth fractured or absent "secondary to the shotgun wound to the face;"

- "The scalp, forehead, face, neck, trunk and extremities show[ed] no evidence of other injuries or other pathological changes except for several minute abrasions over the face;"

- There was dried grass on Haynesworth's face, left wrist, left sweatshirt sleeve, and over the left pant leg.

ECF 167-14.[5]

---

[5] For ease of reference, and since there are multiple defendants, the Court refers to the exhibits a defendant has filed by the docket number.

### B. Troy Coulston and Chris Williams are Tried for the Haynesworth Murder

On February 28, 1991, after a lengthy police investigation as recounted below, Detectives Joseph Hasara and Richard Harris obtained arrest warrants for Christopher Williams and Troy Coulston for Haynesworth's murder. ECF 169, ¶ 109. On March 14, 1991, Coulston was placed under arrest at SCI Camp Hill where he was already in custody on an unrelated matter. Id., ¶ 110. Though the affidavit of probable cause for the arrest is missing, ADA Desiderio testified that the affidavit would have gone to the assistant chief of the DA's homicide unit, David Webb. Pl. Ex. 5, Desiderio Dep. Tr. at 101:7–102:6.

Coulston and Williams were jointly tried for the murder of Michael Haynesworth beginning on January 14, 1992. ECF 169, ¶ 142. Prosecutors called two key witnesses to testify that Coulston committed the murder: Rashida Salaam and James White. Id., ¶¶ 143–44. Salaam and White had previously provided several statements to police which contained shifting details about the murder, but in their latest statements, they implicated Coulston. ECF 167-17, ECF 167-32, ECF 167-39, and ECF 167-41. At the time of the murder on November 20, 1989, Salaam was just 13 years old. ECF 167-25, Trial Tr. (1/15/92) at 5:20–22. James White was 19. See ECF 167-17 at 2.

Salaam testified at trial consistent with her February 26, 1991 statement to Detective Harris, and White testified consistent with his May 3, 1991 statement to Detectives Hasara and Harris, both implicating Coulston as the shooter. ECF 169, ¶¶ 143–44. Both also testified that they were cooperating with the prosecution pursuant to plea deals, and both admitted that they had initially lied to police. Id. There was no physical or forensic evidence linking Coulston to the Haynesworth murder presented at trial. ECF 177, ¶ 140.

The jury heard of several inconsistencies with White's account of the murder. Though White told police that there were only two cars at the scene of the homicide in Fairmount Park—Chris Williams' car and Haynesworth's car, ECF 167-41 at 9–10—the parties stipulated at trial that the molds of the tire tracks found on the grass in Fairmount Park in front of Haynesworth's vehicle did not match the tire tracks of Williams' car. ECF 169, ¶ 146. The jury also heard that fingerprints lifted from Haynesworth's car did not match Williams, Coulston, White, or Salaam, despite White's statement to police that White drove Haynesworth's car to Fairmount Park with Coulston in the back seat next to Haynesworth. Id., ¶ 147; ECF 167-41 at 9.

The trial lasted several days. Based on the criminal trial transcripts, Detective Hasara was the only Defendant Officer to testify. See ECF 167-24, 167-25, 167-26, 167-27, 167-28. On January 22, 1992, Coulston and Williams were convicted of first-degree murder and sentenced to life without parole. ECF 169, ¶ 148. Plaintiff appealed his conviction and filed several petitions for post-conviction relief between 1992 and 1999, all of which were denied. See ECF 167-52.

### C. The CIU Reviews Williams' and Coulston's Convictions

Prior to the Haynesworth murder trial, White had confessed to six homicides while implicating Chris Williams in all six of the homicides and Coulston in two of them.[6] Pl. Ex. 6, ¶ 9. In 2018, the CIU opened a comprehensive investigation into all cases in which James White testified as a witness. ECF 177, ¶ 142. The CIU's investigation revealed that White's testimony in all of the cases was not credible. Pl. Ex. 6, ¶ 92. On February 5, 2021, the Commonwealth stipulated that White's testimony at the Haynesworth trial was not credible. Id., ¶ 93.

After an extensive CIU investigation, Williams was exonerated of all four of his murder convictions – for a separate triple murder and for the Haynesworth murder. Pl. Ex. 6, ¶¶ 12–15.

---

[6] Williams was convicted of four of the homicides, including the Haynesworth homicide, and for another triple murder, and Coulston was only convicted of the Haynesworth homicide. Pl. Ex. 6, ¶ 10.

The court ordered Williams' immediate release in the Haynesworth murder based on Williams' representations that "newly discovered Brady evidence proved his wrongful conviction for the murder of Michael Haynesworth." ECF 169, ¶ 157.

After Williams was exonerated of the Haynesworth murder, Plaintiff, through his post-conviction counsel, Jennifer Merrigan and Jenny West Love Osborne of Phillips Black, filed a Petition for Post-Conviction Relief on March 9, 2021. See Pl. Ex. 42. Plaintiff's PCRA Petition alleged that police and prosecutors never turned over five pieces of exculpatory evidence in the Haynesworth murder trial (Id. at 7–10):[7]

1.  Handwritten notes on a Philadelphia Police Department ("PPD") interview form stating that Chris Williams first shot Haynesworth and then afterwards White shot Haynesworth. Pl. Ex. 43.

2.  A formal statement by Charles Thorn to Detectives Cimino and Ansel taken on October 23, 1991. Pl. Ex. 45. Thorn in the statement told detectives that he was White's former roommate at the detention center and that White told him that Chris Williams shot Haynesworth with a shotgun. Id. at 3.

3.  A PPD activity sheet dated October 29, 1991, describing White's statement to police that Coulston claimed to have killed a man named "Kareem" and Williams claimed to have killed a man named "Fruity," but that Detectives Ansel and Cimino could not locate any information about the murders of either Kareem or Fruity. Pl. Ex. 15.

4.  A PPD activity sheet dated November 26, 1991, showing that police were contemplating seeking an arrest of Theophalis Wilson for the murder of Marron Genrette notwithstanding

---

[7] The Court adopts the CM/ECF docketing pagination throughout this memorandum.

that White's previous statements to police implicated Coulston as the perpetrator. Pl. Ex. 46 at 2.

5. Handwritten notes showing that White claimed Chris Williams killed someone in a house belonging to "Tito." Pl. Ex. 44. No corroborative evidence was found about a murder in Tito's house.

The CIU answered Plaintiff's Petition by conceding that Plaintiff was entitled to relief in the form of a new trial based in part on a determination that material information about James White's credibility was withheld from Plaintiff. ECF 177, ¶¶ 173–74. Relevantly, the CIU's Answer to Coulston's PCRA petition states that during its investigation, the CIU found that White discussed the Haynesworth murder with several other people, and at least two of those conflicting accounts were favorable to Coulston and not previously disclosed to his defense counsel. Pl. Ex. 6, ¶ 80. ADA Arlen Katen, a prosecutor who led the CIU's investigation, testified at her deposition that she observed that police did not provide prosecutors with handwritten notes and sometimes activity sheets.[8] Pl. Ex. 40, Katen Dep. Tr. 59:13–20.

After assessing White's and Salaam's credibility and after its extensive investigation, the CIU recommended that Plaintiff should not be retried in the event his conviction was vacated because James White was the only witness who claimed to have witnessed the shooting and, according to the CIU's ADA Katen's deposition testimony, the withheld materials undermined White's credibility with inconsistent statements about who was the shooter. ECF, ¶ 176; Pl. Ex. 7, Katen Dep. Tr. at 93:8–95:13. The CIU also found that White's description of the Haynesworth murder was inconsistent with evidence found at the crime scene and with the Medical Examiner's findings in the autopsy report. ECF 177, ¶ 178. White testified at his deposition that when he

---

[8] This testimony is relevant to the <u>Monell</u> claims proceeding against the City, as discussed below.

spoke with the CIU prosecutors, he "disavowed all of the previous testimony [he] had given in any prior case," including in "the Haynesworth murder case[.]" Pl. Ex. 101, White Dep. Tr. at 138:3–10.

On November 30, 2021, the Philadelphia Court of Common Pleas vacated Plaintiff's conviction and sentence and ordered a new trial. Pl. Ex. 9. The Court granted the Commonwealth's Motion to *Nolle Pros* without prejudice on all charges. Id.

### D. The Police's Investigation Into Haynesworth's Murder

Discovery in this case was lengthy. The Court below briefly summarizes the material facts from the police's investigation into Haynesworth's murder.

#### 1. Rashida Salaam's First Statement

The day after discovering Haynesworth's body, on November 22, 1989, Detectives Charles Bentham and Richard Lynn brought Rashida Salaam to the Homicide Division for questioning. ECF 169, ¶ 24. Bentham took her statement. Id., ¶ 25. Salaam was just 13 years old at the time of her interview. ECF 167-32 at 2. The parties dispute whether Salaam's mother was present throughout or only when Bentham provided her with Miranda warnings. ECF 179, ¶ 43; ECF 181, ¶ 43. Salaam was interviewed for over eight hours, a practice which violated either a formal or informal "six-hour rule" that, to be admissible, any witness interview could be no longer than six hours. Pl. Ex. 1, Bentham Dep. Tr. 32:11–24. Over the course of the interview, Salaam provided four accounts of Haynesworth's homicide.

*First*, Salaam denied any knowledge, claiming that all she had heard was that Haynesworth was shot in the park. ECF 167-32 at 6–7.

*Second*, after approximately two hours of questioning, Salaam implicated Troy Coulston (aka Saleem).[9]  Id. at 9.  Salaam was then arrested and provided with <u>Miranda</u> warnings with her mother present.  Id.  Afterwards, Salaam added more detail.  She told Detective Bentham that the day of the murder, she had called Haynesworth at Coulston's request and told him to meet her at 48th and Market, and as Haynesworth pulled up, Coulston jumped out from bushes behind Salaam, put a gun to Haynesworth's back, and forced Haynesworth to drive his car with Coulston in the passenger seat.  Id. at 10–12.  Salaam stated that Coulston returned a couple of hours later and told Salaam that he had killed Haynesworth and threatened her life if she talked.  Id. at 13.

*Third*, after signing her statement, Salaam told Bentham that she had lied and added to her story.  Id. at 17.  After Coulston drove off with Haynesworth, Chris Williams followed behind with his own car.  Id.  When Coulston and Williams returned, they said they killed Haynesworth. Id. at 18.  Despite being involved in the planning, Salaam denied that James White, her boyfriend, was involved in any other way.  Id. at 19.

*Fourth*, in an addendum, Salaam told Detective Lynn that White was more involved than she previously suggested.  Id. at 22.  According to Salaam, White went with Coulston into Haynesworth's car when they left the scene while Williams followed behind.  Id.

### 2. Homicide Detectives Interview Other Witnesses Who Provide Differing Accounts of the Murder

Police interviewed several other third-party witnesses after Salaam was arrested.  One witness told police that he had heard from his friend that James White, Chris Williams, and Troy Coulston killed Michael Haynesworth because "Michael had been fooling around with [White]'s girlfriend," Rashida Salaam.  ECF 167-69 at 2.  Another told Detective Hasara that James White

---

[9] Coulston testified at his deposition that "people have called me Saleem."  ECF 167-5, Coulston Dep. Tr. at 19:20–21.  For consistency, the Court refers to "Saleem" as "Coulston" and to "Jim Robertson" or "Jim Richardson" as "James White."  Those identities are undisputed.  <u>See</u> ECF 159, ¶ 35 n.1; ECF 167-21 at 3.

told her that "we" killed Haynesworth because White had heard Haynesworth was "messin with my girlfriend," that Salaam was pregnant, and that the baby could have been White's or Haynesworth's.[10]  ECF 167-21 at 3.  A third witness stated that White confessed to him that he had killed Haynesworth, but after he told White that Haynesworth was his cousin, White backtracked and said that "Chris and [Coulston] did it."  ECF 167-33 at 4.  A fourth witness confirmed to police that White told him Salaam set Haynesworth up, and that White, Williams, and another guy he did not recognize used a shotgun to kill Haynesworth in the park and rob him.  ECF 167-35 at 4–6.  He also said that White admitted to him that "he had done the shooting."  Id. at 6.

### 3.    White's First Statement

Police arrested James White on December 9, 1989.  ECF 167, ¶ 69.  That day, White provided a statement to police in which he described in detail a plot to rob Haynesworth by having Salaam lure Haynesworth to a residence at 4764 Chestnut Street where he, Salaam, Chris Williams, and Troy Coulston were waiting.  ECF 167-17 at 4–5.  Once Haynesworth arrived at the house, White described hearing scuffling and Coulston yelling at Haynesworth.  Id. at 6.  After several minutes, White left the bedroom and saw Haynesworth on the floor all tied up and blindfolded while Coulston was beating him up.  Id.  According to White, Coulston and Williams then put Haynesworth into his own car and laid him down in the back seat.  Id. at 7.  Williams drove his car with White while Coulston drove Haynesworth's car.  Id. at 8.  Coulston drove Haynesworth's car into the park, then White saw Coulston get out of Haynesworth's car, then back into the car, then heard three or four "booms."  Id.

---

[10] The parties dispute whether the witness's, Evy Williams', statement contradicts Salaam's final account.  According to Plaintiff, Evy Williams stated that White acted alone in killing Haynesworth.  According to Defendant Officers, the language White used that "we" killed Haynesworth is consistent with Salaam's version that White, Coulston, and Chris Williams killed Haynesworth.

### 4. Salaam's Second Statement

In February 1991, prosecutors agreed to transfer Salaam's case to juvenile court in exchange for her cooperation as a witness for the Commonwealth. ECF 177, ¶ 82. The same day Salaam's case was decertified from adult court, on February 26, 1991, Salaam interviewed again with Detective Harris. Id., ¶ 84. According to Salaam's written statement, Salaam had informed her lawyer, the Judge presiding over her case, and the prosecutor, ADA David Desiderio, that she wished to give an additional statement. Pl. Ex. 13 at 2. This was Harris's first involvement in the Haynesworth murder investigation. ECF 169, ¶ 82.

Salaam admitted to Harris that her first statement to Detective Bentham on November 22, 1989, was not truthful because she was scared. ECF 167-39 at 2. She then provided a new account of the murder which matched many of the details of White's statement. She said that White, Williams, Coulston, and her plotted to rob Haynesworth. Id. at 3. After Haynesworth arrived at 4764 Chestnut Street, Coulston put a shotgun to Haynesworth's face and told him to get down on the floor. Id. at 4. Salaam reportedly heard from the bedroom Haynesworth hollering like he was in pain. Id. Salaam saw Haynesworth lying on the floor all tied up around the hands and feet with telephone wire and blindfolded around his eyes. Id. at 8. Afterwards, Williams and White walked Haynesworth out of the house, and Coulston followed with a shotgun hanging from his shoulder. Id. at 5. When they left, Salaam stated that she cleaned up the blood from the floor and wiped off all the tables to rid them of fingerprints. Id. About an hour and a half later, White told Salaam that Haynesworth was dead. Id.

Two days after Salaam's statement, on February 28, 1991, Christopher Williams and Troy Coulston were arrested. ECF 169, ¶ 109.

### 5.  White's Second Statement

After Coulston's arrest, White gave a second statement to Detectives Hasara and Harris after admitting that the original statement he gave to Detective Dougherty on December 9, 1989, was not accurate.  ECF 169, ¶¶ 111–12.  In this account, White described Coulston beating Haynesworth by hitting him on the top of his head with the barrel of the shotgun, kicking him in the stomach, and then hitting him again in the head with the wood part of a hammer.  ECF 167-41 at 6–8.  Coulston and Williams plotted to kill Haynesworth, with Coulston offering to kill him because shotguns could not be traced.  Id. at 9.  Coulston put Haynesworth in the back seat of the car and sat with him while White drove; Williams drove his car.  Id.  The two cars pulled up in Fairmount Park on the street, then White drove Haynesworth's car off onto the grass.  Id. at 10. Coulston then went into the backseat of the car and shot at Haynesworth.  Id.

### 6.  Detectives Take Several Other Witness Statements

On September 30, 1991, Detectives Cimino and Barlou took the statement of Craig Vaughn, who told them that White had told him that Chris Williams pulled out a shotgun when they arrived in Fairmount Park, shot Haynesworth in the face, and that White then took Chris's shotgun and shot Haynesworth in the chest.  ECF 167-42 at 4.  Charles Thorn also told Detectives Ansel and Cimino on October 23, 1991, that White told him that Chris Williams shot Haynesworth with a shotgun.  ECF 167-43 at 3.

## II.  PROCEDURAL HISTORY

Plaintiff filed the original Complaint on October 21, 2023.  ECF 1.  On December 22, 2023, before any party answered, Plaintiff filed the First Amended Complaint ("FAC") (ECF 23). Defendant David Desiderio moved to dismiss the FAC on December 29, 2023 (ECF 25), and the Court granted Desiderio's Motion in part and dismissed Count 5 of the FAC for common law malicious prosecution with prejudice, and all other counts without prejudice as to Desiderio.  ECF

39.  Defendants Estate of Francis Ansel (ECF 29), Charles Bentham, Richard Harris, the City of Philadelphia (ECF 40), and Sergeant Royds (ECF 57) each answered the FAC.

On June 24, 2024, Plaintiff filed the Second Amended Complaint ("SAC"), ECF 59, bringing the following five claims under 42 U.S.C. § 1983, which was applicable at the time of the pending Motions for Summary Judgment:

- **Count I**:  Fabrication of evidence in violation of the Fourteenth Amendment, against all individual Defendants;

- **Count II**:  Malicious prosecution in violation of the Fourth and/or Fourteenth Amendments, against all individual Defendants;

- **Count III**: Deliberate suppression of exculpatory evidence in violation of the Fourteenth Amendment, against all individual Defendants;

- **Count IV**:  Municipal liability, against the City of Philadelphia;

- **Count V**:  A supplemental claim for malicious prosecution under the laws of the Commonwealth of Pennsylvania, against all individual Defendants.

On July 18, 2024, Desiderio filed a Motion to Dismiss, ECF 73, which the Court granted in part, dismissing Count 5 of the SAC for common law malicious prosecution against Desiderio with prejudice but denying the Motion as to the remaining four claims.  ECF 95.  The Court on October 16, 2024, denied Motions to Dismiss the SAC by Defendants Bentham, Harris, Royds (ECF 90) and the City of Philadelphia (ECF 89) because those Defendants had already answered the FAC.  ECF 101.  Those parties responded by filing a Rule 12(c) motion for judgment on the pleadings (ECF 106–07), which the Court denied on November 8, 2024.  ECF 111.  Defendants

Estate of Francis Ansel (ECF 80), Desiderio (ECF 110), Bentham, Harris, Royds, and City of Philadelphia (ECF 105) have answered the SAC.[11]

The parties stipulated to the dismissal of Defendant Frank Jastrzembski on June 10, 2025, ECF 154, and on June 12, 2025, the Court granted Plaintiff's unopposed motion to dismiss Defendants Richard Lynn, Raymond Dougherty, and Lieutenant Holley on the express condition that "no remaining defendant will (a) offer evidence or argue that Lynn, Dougherty, and/or Holley's actions or inactions caused Coulston's conviction or (b) argue that Lynn, Dougherty, and/or Holley's actions or inactions served as an intervening cause resulting in the harms and losses claimed by Coulston."  ECF 158.

On June 12, 2025, Desiderio (ECF 157), Ansel, Bentham, Cimino, Harris, Hasara, and Royds (ECF 167), and the City (ECF 168) filed Motions for Summary Judgment.  Plaintiff filed an omnibus response on June 26, 2025, and filed a statement of additional facts.  ECF 176–77.  In his response, Plaintiff withdrew his § 1983 malicious prosecution claim under the Fourth Amendment, narrowed the § 1983 malicious prosecution claim to Harris only, and narrowed his claims against Desiderio to Count I for fabrication of evidence and Count II for malicious prosecution under the Fourteenth Amendment.  Defendant Officers and the City (ECF 178), and Desiderio (ECF 180) replied on July 10, 2025.  Plaintiff filed a surreply, with Court approval, on July 17, 2025.  ECF 184.

Due to Plaintiff's narrowing of the issues in his response, the Court considers whether summary judgment is appropriate on the following counts as to the following Defendants:

- **<u>Count I</u>**:  Fabrication of evidence in violation of the Fourteenth Amendment, against all Defendant Officers and Defendant Desiderio;

---

[11] The Estates of Joseph Hasara and John Cimino have not answered the SAC.  Plaintiff has not moved for a default. Accordingly, the Court will dismiss them from the case for failure to prosecute.

- **Count II**:  Malicious prosecution in violation of the Fourteenth Amendment, against Defendant Harris and Defendant Desiderio;

- **Count III**:  Deliberate suppression of exculpatory evidence in violation of the Fourteenth Amendment, against all Defendant Officers;

- **Count IV**:  Municipal liability, against the City of Philadelphia;

- **Count V**:  A supplemental claim for malicious prosecution under the laws of the Commonwealth of Pennsylvania, against all Defendant Officers.

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed."  Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## IV.    DISCUSSION – ADA DESIDERIO'S MOTION

### A.  Parties' Contentions

Plaintiff raises two § 1983 claims against ADA Desiderio based on the Fourteenth Amendment, one for fabrication of evidence and one for malicious prosecution.  Plaintiff argues that Desiderio participated in the alleged fabrication of Rashida Salaam's second statement to Harris on February 26, 1991.  Desiderio asserts in his opening brief that he is entitled to summary judgment on both counts because the Fourteenth Amendment protects individuals from conduct at trial which violates a person's due process rights.  Therefore, Desiderio argues that he is absolutely immune from allegations arising out of his presentation of evidence—even if fabricated—at trial and for a malicious prosecution claim which relies on his trial conduct.  See generally ECF 157. Desiderio further asserts in the alternative that he is entitled to qualified immunity on the malicious prosecution claim because he did not initiate the proceedings against Plaintiff and there is no clearly established law recognizing a Fourteenth Amendment right against malicious prosecution. Id. at 11–16.

Plaintiff responds that the conduct forming the basis for Plaintiff's claims against Desiderio is not his trial conduct, but rather his alleged collusion with Detective Harris to manipulate Salaam's second statement before Coulston's arrest, which the Third Circuit has held is investigative, not prosecutorial, conduct and not entitled to absolute immunity.  ECF 176 at 57–63.  In reply, Desiderio challenges the factual bases for the claims against him as purely speculative, argues that the fabrication claim is predicated on pre-trial conduct and thus must be

brought under the Fourth Amendment, and contends that there is no evidence he initiated criminal

prosecution sufficient for a malicious prosecution claim.[12]  See generally ECF 180.

Because the evidence forming the basis for the claims against Desiderio is insufficient and

too speculative to raise a genuine dispute of material fact, the Court will grant summary judgment

and dismiss ADA Desiderio from the case.

## B.  Analysis[13]

Plaintiff argues that a reasonable jury could find based on the record evidence that

Desiderio colluded with Harris to coerce Salaam into providing a statement that matched James

---

[12] Desiderio apparently concedes his claim of absolute immunity.  After raising absolute immunity in his opening brief, Desiderio's Reply nowhere mentions absolute immunity and fails to respond to Plaintiff's Third Circuit case law and argument about the investigative nature of the conduct at issue.  Desiderio's Reply pivots to challenging the underlying factual predicate as not sufficiently supported by the record evidence to raise a genuine dispute of material fact.  The Court will therefore not address absolute immunity.  Regardless, whether or not Desiderio is entitled to absolute immunity has no bearing on the outcome – the Court will grant summary judgment on the claims against Desiderio.

[13] A note about the Undersigned's personal experience.  The Undersigned served as an Assistant District Attorney in the Philadelphia DA's Office from January 1966 through January 1970, the last year of which I was Chief of the Homicide Division.  I became very familiar with some of the procedures described in this case, specifically the fact that the lead homicide detective was responsible for preparing a "binder" of all documentary evidence material for the prosecution.  In some cases, there were several binders that contained police reports, written statements, or police summaries of written statements commonly referred to as a "49," relating to the form number of the document used.

In this role, I directed that the ADAs assigned to prosecute homicide cases were responsible for reviewing these materials with the lead homicide investigator prior to any trial, which was usually accomplished by a face-to-face meeting in the DA's office, usually attended by most, if not all, of the police officers and crime lab representatives prior to the start of a trial and even prior to an anticipated guilty plea.

My experience as a prosecutor changed after entering private practice.  Judge Joseph Sloane, for whom I had served as a law clerk, appointed me as counsel for a 13-year-old young man who had been arrested and accused of murdering a police officer while the officer was sitting in his patrol car in North Philadelphia.  Needless to say, the case garnered a great deal of public attention.  Judge Sloane also appointed a more experienced counsel, Samuel Kagle, Esquire, as my co-counsel, but I served as lead defense attorney throughout this case.  My client had signed a written confession, and the police had other witness statements.

The defendant was convicted at a first trial, but the trial judge granted a new trial because of an error in the admission of certain testimony.  In the second trial, the defendant's confession was a major piece of evidence.  After the second trial, I was able to successfully get the confession suppressed.  A third trial was held and the jury found the defendant guilty of second degree murder which, at that time, called for a maximum 10–20 year prison sentence, which the defendant served.  I raised a number of issues in an appeal to the Pennsylvania Supreme Court, but the Court affirmed the conviction.  See Commonwealth v. Hogan, 393 A.2d 1133 (Pa. 1978).  I never experienced any of the issues presented in this case as a prosecutor or defense counsel.

White's account so that the prosecution could button-up its case against Coulston. The evidence reflecting Desiderio's participation in such an alleged scheme, however, is conjecture at best.

The thrust of Plaintiff's evidence of fabrication is that Desiderio requested that Harris interview Salaam after she accepted a plea deal, and during that interview, Salaam changed her story to resolve several inconsistencies between her initial statement and White's December 1989 account of the crime. Though this may have helped the prosecution, there is no other evidence that anything Salaam said in that interview was fabricated. Plaintiff points to the circumstances of the interview—including that Desiderio asked Harris to interview Salaam when he had no prior involvement in the case, Harris conducted the interview on the same day Salaam's case was decertified, and two days after Salaam provided the statement Coulston was arrested—as evidence that Desiderio helped fabricate Salaam's statement to cement the case against Coulston. But the undisputed evidence reflects that Salaam herself told her lawyer, the presiding Judge, and Desiderio that she wanted to give an additional statement regarding the Haynesworth murder without any evidence that she was urged to do so by Desiderio. Pl. Ex. 13 at 2.

Even if there is a dispute of fact whether Desiderio knew beforehand what Salaam might say in the interview to implicate Coulston (which Desiderio denies), there is no evidence Desiderio fed Salaam the information or colluded with Harris beforehand to suggest to Salaam that her statement contain certain details. Simply put, there is insufficient non-speculative evidence to raise a genuine dispute of material fact whether Desiderio fabricated Salaam's testimony. Razak v. Uber Techs., Inc., 951 F.3d 137, 144 (3d Cir. 2020) ("In attempting to defeat summary judgment, speculation and conclusory allegations do not satisfy the nonmoving party's duty." (citation modified)).

Plaintiff's Fourteenth Amendment malicious prosecution claim against Desiderio fails for similar reasons.  It is undisputed that it was not Desiderio who approved of the charges against Coulston.  ECF 176 at 63–64.  Plaintiff's argument that Desiderio initiated Coulston's criminal prosecution is based on the speculative evidence "that Desiderio directed the fabrication of Salaam's February 26, 1991 statement corroborating White's account of the murder" and that fabrication of evidence "interfered with the discretion of the prosecutor[.]"  Id.; Cf. Gallo v. City of Philadelphia, 161 F.3d 217, 220 n.2 (3d Cir. 1998) ("[A] § 1983 malicious prosecution claim might be maintained against one who furnished false information to, or concealed information from, prosecuting authorities." (citation omitted)).  But, as explained above, that evidence does not create a genuine dispute of material fact.

## V.    DISCUSSION – DEFENDANT OFFICERS' MOTION

### A.  Plaintiff Can Show a Compensable Liberty Interest

Defendant Officers first argue that each of Plaintiff's claims brought pursuant to 42 U.S.C. § 1983—fabrication of evidence (Count I), malicious prosecution under the Fourteenth Amendment (Count II), and deliberate suppression of exculpatory evidence (Count III)—fail because Plaintiff cannot establish a compensable liberty interest he was deprived of since he was already incarcerated on charges separate and apart from his conviction for the Haynesworth murder.  ECF 167 at 11–14.  According to Defendant Officers, Plaintiff cannot show the "violation of a right secured by the Constitution and laws of the United States[.]"  West v. Atkins, 487 U.S. 42, 48 (1988).

Defendant Officers, however, rely on a constrained conception of a liberty interest that is in tension with Supreme Court and Third Circuit precedent.  True, in the Fourth Amendment

malicious prosecution context, deprivation of liberty requires a physical seizure.[14]  But Plaintiff

withdrew his Fourth Amendment claim.  ECF 176 at 30.  Plaintiff's remaining § 1983 claims rely

on the Due Process Clause of the Fourteenth Amendment and assert that Plaintiff's other liberty

interests were violated when he was maliciously prosecuted and deprived of a fair trial through the

fabrication of evidence and/or through the deliberate suppression of exculpatory evidence.  ECF

176 at 15 n.6; see Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972) ("[T]he

Court has required due process protection for deprivations of liberty beyond the sort of formal

constraints imposed by the criminal process."); Id. at 572 n.11 ("[Liberty] is not confined to mere

freedom from bodily restraint." (citation modified)); Albright v. Oliver, 510 U.S. 266, 283 (1994)

(Kennedy, J., concurring) ("We have held, of course, that the Due Process Clause protects interests

other than the interest in freedom from physical restraint[.]").[15]

        While the viability of a malicious prosecution claim based on procedural due process is

questionable (which the Court analyzes below), the Third Circuit has held that fabricating and

deliberately suppressing evidence deprive a person of a fair trial.  Black v. Montgomery Cnty.,

835 F.3d 358, 370 (3d Cir. 2016) ("Fabricated evidence is an affront to due process of law, and

state actors seeking to frame citizens undermine fundamental fairness and are responsible for

'corruption of the truth-seeking function of the trial process'" (quoting United States v. Agurs, 427

U.S. 97, 104 (1976))).[16]  That implicates a liberty interest.

---

[14] Defendant Officers string-cite cases that rely on a § 1983 claim brought under the Fourth Amendment.  See ECF
167 at 12.

[15] Justice Thomas joined Justice Kennedy's concurring opinion.

[16] The Third Circuit's holding in Black that conviction at the underlying criminal trial is not a "prerequisite to a stand-
alone due process claim against a state actor for fabrication of evidence" further supports that there can be § 1983
liability for fabrication of evidence based on deprivation of liberty even absent incarceration.  Black, 835 F.3d at 370.

The Court accordingly rejects Defendant Officers' threshold argument. While Plaintiff's concurrent incarceration on unrelated charges may certainly limit Plaintiff's potential damages recovery, that is an issue for another day at trial.

## B. Fabrication of Evidence (Count I)

Defendant Officers argue that the Court should grant summary judgment on the fabrication of evidence claim because (a) there is no evidence of Defendant Officers Royds, Ansel, Cimino, or Hasara's personal involvement; (b) there is no evidence that any officer falsified or offered evidence in bad faith; and (c) Defendant Officers are entitled to qualified immunity because there was no constitutional violation and there was no clearly established law that providing inconsistent witness statements to a prosecutor could constitute fabrication of evidence. ECF 167 at 36–47.

A party can bring a stand-alone § 1983 claim for fabrication of evidence based on the Fourteenth Amendment. Halsey v. Pfeiffer, 750 F.3d 273, 294 (3d Cir. 2014). At summary judgment, Plaintiff must show that Defendant Officers offered the allegedly fabricated evidence in bad faith, which includes intent to submit the evidence "willfully, knowingly, or with a reckless disregard for its truth," Mervilus v. Union County, 73 F.4th 185, 194–95 (3d Cir. 2023), and must show that "there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted," Halsey, 750 F.3d at 294.

Plaintiff here, however, fails to establish through sufficient record evidence that Defendant Officers fabricated evidence when they submitted to the prosecutors James White's and Rashida Salaam's statements implicating Coulston in the Haynesworth murder. Summary judgment on Count I will therefore be granted.

### 1. Plaintiff's Evidence of Fabrication

Plaintiff argues that there are genuine disputes of material fact whether the Defendant Officers recklessly disregarded the truth of James White's and Rashida Salaam's statements.

White provided two formal statements to police about the Haynesworth murder.  According to Plaintiff, in addition to internal inconsistencies between his two statements as well as contradictions with Rashida Salaam's accounts, Defendant Officers had independent statements from other third-party witnesses casting doubt on the credibility of White's statements implicating Plaintiff as the shooter.  ECF 167-21 at 3 (Evy Williams identified James White as the shooter); ECF 167-33 at 3–4 (Richard Johnson told Detective Jastrzembski that White had a practice of using Salaam to lure drug dealers to a location for White to rob them, and that White initially admitted to Johnson that he had killed Haynesworth); See also ECF 167-42, ECF 167-43 (implicating Chris Williams as the shooter).  White's statements can also be seen as inconsistent with undisputed forensic evidence.[17]  Notwithstanding the inconsistencies, according to Plaintiff, Defendant Officers failed to investigate further to corroborate White's statements.  See ECF 177, ¶ 117; Pl. Ex. 16, Royds Dep. Tr. 155:15–158:9, 172:11–174:14.

As to Rashida Salaam, Plaintiff points to the circumstances of her interviews that should have alerted Defendant Officers to the potential she was not forthcoming.  At her initial statement, police interviewed her for nearly eight hours, a practice which violated either a formal or informal "six-hour rule" that, to be admissible, any witness interview could be no longer than six hours.  Pl. Ex. 1, Bentham Dep. Tr. 32:11–24.  Salaam was just 13, and it is disputed whether her mother was present throughout the entire interview.  ECF 179, ¶ 43; ECF 181, ¶ 43.  Plaintiff argues that Defendant Officers should have accounted for Salaam's motive to provide a statement that helps the prosecution.  ECF 176 at 26–27.  Plaintiff also points to evidence to suggest that her second

---

[17] For instance, White's second statement to Harris and Hasara on May 3, 1991 describes how Plaintiff violently beat Haynesworth and struck him with a hammer, Pl. Ex. 33 at 7–8, but the Medical Examiner's report from the day of the murder noted that "[t]he scalp, forehead, face, neck, trunk and extremities show no evidence of other injuries or other pathological changes except for several minute abrasions over the face[.]"  ECF 167-14 at 3.  White also stated that the only other car in Fairmount Park was Chris Williams' car and that the car never drove on the grass, but there was evidence of tire tracks on the grass in front of Haynesworth's car that did not match Williams' car.  ECF 169, ¶¶ 18–20; ECF 177, ¶ 114.

statement taken by Detective Harris was manufactured, as Harris waited an hour and twenty minutes between advising her of her rights and before interviewing her alone without an adult present. Id. at 27. According to Plaintiff, these facts, coupled with her plea deal and the fact that her statement corroborated White's testimony, could lead "[a] reasonable jury could conclude that during this time period Harris was ensuring that Salaam would give a statement that fixed the existing inconsistencies between her account and White's by telling her the details she needed to confirm[.]" Id.

### 2. Plaintiff's Evidence is Insufficient to Show Fabrication

Plaintiff's evidence is insufficient to establish that the Defendant Officers fabricated evidence. The Court first starts from the premise that, as the Third Circuit has repeatedly emphasized, "it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case." Halsey, 750 F.3d at 295; see also Black, 835 F.3d at 372 (acknowledging that a plaintiff alleging a due process violation for fabrication of evidence faces "hurdles"). Thus, to sustain this claim, it is not even enough that James White, one of the prosecution's central witnesses against Plaintiff at his criminal trial, "disavowed" the testimony he gave in "the Haynesworth murder" at his deposition in this lawsuit. Pl. Ex. 101, White Dep. Tr. at 138:3–10; Halsey, 750 F.3d at 295 (holding that "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong").

The Halsey Court cautioned that "we hasten to add that courts in this Circuit should not permit a criminal defendant who later brings a civil action against state actors who had been involved in his prosecution to use this opinion beyond the scope of our holding." Halsey, 750 F.3d at 295. In Halsey, the Third Circuit reversed the district courts' dismissal of the fabrication claim

24

where the officers allegedly told the prosecutor the defendant confessed where he had not done so and added details to the confession to enhance its credibility.  Id. at 289.

Plaintiff relies heavily on a recent Third Circuit case which expanded the scope of fabrication claims to include persuasive evidence that the officer "formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth."  Mervilus, 73 F.4th at 194–95.  According to Plaintiff, Defendant Officers can be liable for fabricating evidence based on showing that they recklessly disregarded the truth of James White's and Rashida Salaam's statements in failing to investigate the material discrepancies and ignoring suspicious circumstances of Salaam's interview.  But Mervilus involved largely different facts.

In Mervilus, the Third Circuit reversed the district court's grant of summary judgment on the plaintiff's fabrication claim where at the original criminal trial, the prosecution introduced the problematic testimony of a polygraph examiner.  Id. at 192–93.  The examiner testified that based on the polygraph results, Mervilus "was being deceptive when he denied responsibility for the crime," but the Third Circuit noted the significant anomalies in the examiner's methodology.  Id. at 192.  The examiner relied on a method considered to be "an outlier in the polygraph world" when he tested the plaintiff.  Id. at 190.  He operated his polygraph practice "with no oversight from the Police Department" and the "Department had no policies or procedures related to polygraph tests."  Id. at 191.  The examinations were "never peer-reviewed by Police Department personnel or others in the field" and, as the Third Circuit summarized, the polygraph examiner essentially "relayed to the prosecution his conclusion … without anyone checking his work."  Id. On these facts, the Third Circuit held that a jury could conclude that the evidence from the polygraph examination was fabricated because the examiner "had reason to doubt his method's

validity and reliability, used biased techniques to examine Mervilus, and rendered a conclusion not compelled by the data." Id. at 195.

The Court acknowledges that Plaintiff contends there are similarities between the facts in this case and in Mervilus. Here, Plaintiff cites evidence to show that Defendant Officers had reason to doubt the reliability of White's statements in light of the contradictions between his account and other statements and the forensic evidence. But in Mervilus, the polygraph examiner who allegedly fabricated evidence by ignoring red flags testified at trial and had strong reason to doubt the credibility of his trial testimony based on unproven scientific methodologies and the fact that the victim did not identify the defendant at trial. Here, the record reflects only Detective Hasara was called as a witness at trial. It is undisputed—except for the five documents in dispute that were allegedly withheld from the prosecution—that Defendant Officers provided the inconsistent statements to the prosecutor who made credibility determinations for the witnesses. These are issues of credibility, not of fabricating evidence – two teenage eyewitnesses made various statements about the murder and shifted details. Desiderio testified it was his job, not the detectives', to assess the credibility of the witnesses based on the provision of inconsistent statements. ECF 167-57, Desiderio Dep. Tr. at 111:16–24, 254:2–11. Furthermore, that is the task of the jury in our system, not for the homicide detectives.

Even Mervilus recognized that the "intent requirement" for a fabrication claim "is stringent[.]" Mervilus, 73 F.4th at 194. Black's law dictionary defines "fabricate" as "[t]o invent, forge, or devise falsely." Fabricate, Black's Law Dictionary (12th ed. 2024). Mervilus does not establish that police fabricate evidence when they put forth evidence notwithstanding awareness of potential contradictions in a witness's statements, and the Court will not make that leap. The Court declines to stretch Mervilus's holding further to this case.

### C.  Malicious Prosecution Under the Fourteenth Amendment and State Law[18]

Detective Harris argues that he is entitled to summary judgment on both malicious prosecution claims because (a) Plaintiff has no compensable liberty interest, (b) Harris did not initiate Plaintiff's criminal proceeding, (c) probable cause existed for Plaintiff's prosecution, and (d) Harris did not act with malice.  ECF 167 at 25–36.  Harris also raises the defense of qualified immunity as to the malicious prosecution claim under the Fourteenth Amendment, arguing that there was no clearly established procedural due process right against malicious prosecution under the Fourteenth Amendment in 1992.  Id. at 48–49.

### 1.  Harris is Not Entitled to Qualified Immunity

The Court will first address qualified immunity.  Defendant Officers are correct that the viability of a stand-alone Fourteenth Amendment malicious prosecution claim today remains murky.  Prior to 1994, and throughout the duration of the Haynesworth murder investigation and Plaintiff's subsequent prosecution, the Third Circuit permitted Fourteenth Amendment malicious prosecution claims by proving a violation of the common law tort based on a theory of substantiative due process.  Gallo, 161 F.3d at 221 (citing Lee v. Mihalich, 847 F.2d 66, 69–70 (3d Cir. 1988)).  In 1994, however, the Supreme Court unambiguously foreclosed predicating § 1983 malicious prosecution claims on substantive due process.  Albright, 510 U.S. at 271.  The Supreme Court's opinion in Albright left open the possibility of basing a § 1983 malicious prosecution claim on procedural due process embedded in the Fourteenth Amendment.

Since Albright, the Third Circuit has reached seemingly inconsistent conclusions on whether procedural due process can support a § 1983 malicious prosecution claim.  Compare Torres v. McLaughlin, 163 F.3d 169, 172 (3d Cir. 1998) ("Albright stands for the broader

---

[18] Plaintiff limits his malicious prosecution claim to Harris and withdraws the claim as to the other Defendant Officers. ECF 176 at 31 n.14.

proposition that a section 1983 claim may be based on a constitutional provision other than the Fourth Amendment. However, we note that <u>Albright</u> commands that claims governed by explicit constitutional text may not be grounded in substantive due process."), <u>and</u> <u>Washington v. Hanshaw</u>, 552 F. App'x 169, 174 n.3 (3d Cir. 2014) (nonprecedential) ("Our cases interpreting Albright have suggested that § 1983 malicious prosecution claims may be predicated on constitutional provisions other than the Fourth Amendment, such as procedural due process."), <u>with</u> <u>Gallo</u>, 161 F.3d at 222 (concluding that under <u>Albright</u>, the "constitutional violation is the deprivation of liberty accompanying the prosecution," which suggests that the Fourth Amendment is the exclusive source of claims of malicious prosecution). <u>See also</u> <u>Halsey</u>, 750 F.3d at 290 n.14 (noting the difference between <u>Torres</u> and <u>Gallo</u> on the viability of a Fourteenth Amendment malicious prosecution claim but declining to resolve the issue because the plaintiff abandoned the Fourteenth Amendment theory). That question remains unresolved. <u>Lewis v. City of Philadelphia</u>, No. 19-cv-2847, 2020 WL 1683451, at *8 (E.D. Pa. Apr. 6, 2020) (Baylson, J.) ("As reflected in <u>Gallo</u>, <u>Torres</u>, and <u>Halsey</u>, there was, and continues to be, confusion amongst lower courts about how the Supreme Court's decision in <u>Albright</u> impacts the ability to maintain a malicious prosecution claim based on the right to procedural due process guaranteed by the Fourteenth Amendment.").

The Court agrees with Defendant Officers that as of 1994, the law on Fourteenth Amendment malicious prosecution claims is not clearly established. But the conduct at issue occurred prior to 1994 when the law was clearly established in the Third Circuit, and the clearly established prong of the qualified immunity inquiry "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." <u>Pearson v. Callahan</u>, 555 U.S. 223, 244 (2009) (citation modified). Under binding Third

Circuit precedent, qualified immunity based on the "clearly established" prong is foreclosed where the conduct underlying a Fourteenth Amendment malicious prosecution claim occurred prior to the Albright decision. Gallo, 161 F.3d at 220 n.4 ("If, as the record suggests, all of these actions occurred prior to 1994, then [the officers] are not entitled to qualified immunity because the pre-Albright law of this circuit clearly provided that malicious prosecution violated federal law.").

### 2. Summary Judgment Will Be Granted on Plaintiff's Fourteenth Amendment Malicious Prosecution Claim

However, Plaintiff's § 1983 Fourteenth Amendment malicious prosecution claim fails for a different reason: there is an adequate state law remedy in Pennsylvania for malicious prosecution. The Supreme Court in Parratt v. Taylor held that "a state actor's random and unauthorized deprivation of [an] interest [protected by the Due Process Clause] cannot be challenged under 42 U.S.C. § 1983 so long as the State provides an adequate postdeprivation remedy." Albright, 510 U.S. at 284 (Kennedy, J., concurring) (citing Parratt v. Taylor, 451 U.S. 527, 535–44 (1981)). Because Fourteenth Amendment malicious prosecution claims must be based on a deprivation of liberty (or life or property) without due process (i.e., procedural due process), Justice Kennedy concluded in his concurrence in Albright that there is no "legitimacy to invoke § 1983" where the State "provides a [post-deprivation] tort remedy for malicious prosecution." Id. at 285–86.

Other Courts of Appeal, based in part on Justice Kennedy's concurrence and citing to Parratt, have precluded Fourteenth Amendment malicious prosecution claims where state law provides a post-deprivation remedy for malicious prosecution. Newsome v. McCabe, 256 F.3d 747, 751 (7th Cir. 2001), abrogated on other grounds by Manuel v. City of Joliet, Ill., 580 U.S. 357 (2017) ("[S]atisfying the elements of the state-law tort of malicious prosecution, far from being the foundation of a constitutional tort …, *knocks out* any constitutional tort of malicious

prosecution[.]" (emphasis in original)); Myers v. Koopman, 738 F.3d 1190, 1193 (10th Cir. 2013) ("The district court rightly rejected Myers' Fourteenth Amendment malicious-prosecution claim under 42 U.S.C. 1983 because Colorado law provides an adequate remedy."); Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) ("It is perfectly clear that the Due Process Clause cannot serve to ground the appellants' federal malicious prosecution claim.  No procedural due process claim can flourish in this soil because Massachusetts provides an adequate remedy for malicious prosecution.").  Last year, Justice Gorsuch reiterated in his dissent that "a procedural due process claim for malicious prosecution may come with its own set of limitations.  After all, when a State provides exactly the tort claim the plaintiff seeks, it provides him with all the process he is due."  Chiaverini v. City of Napoleon, Ohio, 602 U.S. 556, 570 (2024) (Gorsuch, J. dissenting).

The Third Circuit has acknowledged that a § 1983 malicious prosecution claim could be based on the procedural component of the Fourteenth Amendment's Due Process Clause.  See, e.g., Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 792 (3d Cir.2000).   But that acknowledgment is entirely consistent with Parratt, because where a State does not provide a malicious prosecution tort remedy, Parratt drops out and a plaintiff can potentially pursue a § 1983 malicious prosecution claim based on the Due Process Clause.   Albright, 510 U.S. at 286 (Kennedy, J., concurring) ("[I]f a State did not provide a tort remedy for malicious prosecution, there would be force to the argument that the malicious intention of a baseless criminal prosecution infringes an interest protected by the Due Process Clause and enforceable under § 1983.").  The Court is unaware of Third Circuit precedent addressing a Fourteenth Amendment malicious prosecution claim and grappling with the Supreme Court's holding in Parratt as it pertains to the availability of a post-deprivation state law remedy.

Pennsylvania provides a remedy for malicious prosecution, and Plaintiff pleads it.[19]  The Court will therefore grant summary judgment with respect to Plaintiff's § 1983 malicious prosecution claim based on the Fourteenth Amendment.

### 3.  Plaintiff's State Law Malicious Prosecution Claim (Count V) Will Be Dismissed Without Prejudice

The Court will dismiss Plaintiff's state law malicious prosecution claim without prejudice to Plaintiff re-filing his common law malicious prosecution allegations in state court because, as the Court explains below, the Court dismisses the § 1983 claims against Defendant Officers and declines to exercise supplemental jurisdiction over the remaining state law claim.

### D.  Deliberate Suppression of Exculpatory Evidence (Count III)

Plaintiff contends that Defendant Officers knowingly concealed from prosecutors five exculpatory pieces of evidence:  (1) handwritten notes on a PPD interview form, (2) a formal statement given to police by Charles Thorn, (3) a PPD activity sheet dated October 29, 1991, (4) a PPD activity sheet dated November 26, 1991, and (5) other police handwritten notes tending to undermine James White's claims that Chris Williams killed another individual.  ECF 176 at 36–38.  However, based on the undisputed facts in the record, Plaintiff has not sufficiently shown the personal involvement of any officer in deliberately suppressing evidence from the prosecutor.  Defendant Officers are entitled to summary judgment on Count III.

The Third Circuit in Dennis v. City of Philadelphia recognized a claim for deliberate deception separate and apart from a Brady violation.  Such a claim requires "the knowing use of false testimony or other fabricated evidence or from concealing evidence to create false testimony to secure a conviction."  Dennis, 19 F.4th at 291.  While the contours of the claim are not precise,

---

[19] The fact that Plaintiff's brief has one analysis for both the § 1983 claim and the state law claim is further support that the state law remedy is adequate to cover the alleged constitutional violations.

deliberate suppression claims require some "Brady-plus" misconduct: "some action(s) that concealed or suppressed evidence, plus the specific intent to deceive the court and jury in order to secure a conviction, rather than an intent to 'merely' conceal or withhold exculpatory evidence." Natividad v. Raley, No. 22-cv-5061, 2025 WL 1550740, at *9 (E.D. Pa. May 30, 2025) (Pappert, J).

It is also axiomatic that § 1983 liability cannot be predicated on *respondeat superior* – in other words, Plaintiff must show the personal involvement of each officer. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 290–91 (3d Cir. 2018). At this stage, that requires "a § 1983 plaintiff [to] produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." Id. at 291. Thus, for the deliberate suppression claim, Plaintiff bears the burden of showing that each Defendant Officer took part in knowingly and deliberately suppressing evidence from the prosecutor and from Mr. Coulston's defense counsel, or at a minimum showing "personal direction or [ ] actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

The Court cannot discern evidence in the record that any of the Defendant Officers personally participated in deliberately suppressing evidence. It is undisputed that ADA Desiderio "repeatedly confirmed that he turned over all the information he received from detectives to the defense." ECF 179, ¶ 168. Detective Bentham testified that detectives from the Homicide Division would prepare a homicide binder containing all the relevant documents, and that the primary purpose of the binder was to provide investigative information from the Homicide Division to the DA's Office. Pl. Ex. 1, Bentham Dep. Tr. at 134:14–135:9. But Plaintiff is missing the critical link proffering evidence that any of the Defendant Officers knowingly concealed any of the five pieces of evidence from the homicide binder that went to the prosecutor. The evidence

that the Court reviewed, in fact, reflects that Detective Lynn was the lead detective on the Haynesworth investigation and that the assigned detective's responsibilities included "gather[ing] all the pertinent and relevant documents" which would "go into [the] binder."[20] Id., Tr. at 95:19–24, 100:1–8.

That each of the Defendant Officers was part of the investigation, may have known the contents of the file, and may have had access to the file is not enough to show at this stage that they affirmatively concealed evidence from the file, or even that they acquiesced in deliberately suppressing information. See Natividad, 2025 WL 1550740, at *10–*11 (Pappert, J.) ("[T]he mere fact that the detectives all worked on the same case and had basic information about the investigation does not show that any one of them was *personally* involved in any act that deceived the court."). This case mirrors Jutrowski – though evidence may have been suppressed, Plaintiff groups together officers, any one of which may be responsible for allegedly suppressing evidence with intent. See Jutrowski, 904 F.3d at 290 (affirming summary judgment where the plaintiff could not identify—among a group of officers—the officer who used excessive force).[21]

## VI.  DISCUSSION – CITY'S MOTION

Count VI of the Second Amended Complaint alleges a Monell claim for municipal liability against the City of Philadelphia. Because "local governments are responsible only for their *own*

---

[20] Detective Lynn (who is deceased) was dropped as a defendant by stipulation on June 12, 2025. ECF 158. The Court recognizes that the parties agreed no remaining defendant would argue that Detective Lynn's actions or inactions "served as an intervening cause resulting in the harms and losses claimed by Coulston." Id. But the absence of evidence that any of the other officers knowingly concealed those five pieces of evidence from the homicide binder, or that any other officer had even a responsibility within the Homicide Division to ensure the completeness of the binder before going to the DA's Office, is telling.

[21] The Court repeats the obvious, that the police had somewhat contradictory accounts of who caused the death of Haynesworth. There was some evidence presented at trial that Coulston was involved in the murder. But based on the CIU's investigation, Plaintiff has presented evidence showing that some materials may not have been turned over to the defense by the homicide detectives. At this point, however, given the existence of eyewitness testimony at the criminal trial, it is too speculative to reason that the allegedly suppressed evidence would have been enough to result in acquittal, in order to allow the case to proceed against the Defendant Officers.

illegal acts," <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011) (citation modified), and municipal liability cannot be predicated on *respondeat superior*, there are two ways for a § 1983 claim against a municipality to proceed:  "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice[.]"  <u>Forrest v. Parry</u>, 930 F.3d 93, 105 (3d Cir. 2019) (citation modified).  Plaintiff thus asserts that the City is liable for (1) an unconstitutional policy or custom and (2) a failure to supervise or discipline its officers.  ECF 176 at 48–49.

The City responds with several arguments supporting summary judgment on the <u>Monell</u> claim.  First, that there are no underlying constitutional violations against the individual Defendant Officers, and without predicate liability, the <u>Monell</u> claim cannot proceed.[22]  ECF 168 at 7–8.  Second, that Plaintiff did not proffer any relevant evidence of a municipal policy or custom that is temporally proximate to the Haynesworth murder investigation, any evidence that a policymaker acted with deliberate indifference that is attributable to the City, or that the City was the proximate cause of Plaintiff's injuries.  <u>Id.</u> at 8–14.  Third, the City argues Plaintiff has provided no evidence of specific training the City failed to provide that caused Plaintiff's injuries such that the City was deliberately indifferent towards deficiencies in its training, supervision, and discipline of its officers.  <u>Id.</u> at 14–18.

---

[22] The Court rejects this argument outright.  The City is incorrect.  The City could still have municipal liability even if the individual officers are not liable so long as there was an underlying constitutional violation.  <u>See</u> <u>Mervilus</u>, 73 F.4th at 196–97 ("A municipality can be held liable under <u>Monell</u>, even when its officers are not, unless such a finding would create an *inconsistent* verdict.  Where it is possible for the <u>Monell</u> defendant to cause constitutional harm without any individual defendant violating the plaintiff's rights, it is not inconsistent for a jury to find only the Monell defendant liable." (citation modified)); <u>see</u> <u>also</u> <u>Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Med. Servs. Training Inst.</u>, 318 F.3d 473, 482 (3d Cir. 2003) ("It is possible for a municipality to be held independently liable for a substantive due process violation even in situations where none of its employees are liable.").

To establish a <u>Monell</u> claim against a municipality, a plaintiff must show (1) a deprivation of a federal right, <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986); (2) a relevant policy or custom attributable to the City, <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 691 (1978); and (3) "a direct causal link between the municipal action and the deprivation of the federal [right,]" <u>Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown</u>, 520 U.S. 397, 404 (1997). The municipality is liable when either the policy or custom facially violates the Constitution, or if not unconstitutional itself, is the "moving force" behind the constitutional violation. <u>Thomas v. Cumberland Cnty.</u>, 749 F.3 217, 222 (3d Cir. 2014).

### A. Unconstitutional Policy and Custom

Plaintiff argues that the City had a policy and practice—and, alternatively, a custom—of PPD homicide detectives withholding activity sheets and handwritten notes from the District Attorney's Office and criminal defendants which resulted in the suppression of exculpatory information from Plaintiff. ECF 176 at 48–49. To establish a policy, Plaintiff must point to evidence of "a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" who "issue[d] an official proclamation, policy, or edict." <u>Est. of Roman v. City of Newark</u>, 914 F.3d 789, 798 (3d Cir. 2019) (citation omitted). Plaintiff does not identify any decisionmaker with final authority nor any official City policy of withholding these documents from prosecutors.[23]

Plaintiff, however, may rely on evidence of a custom. A "custom" is a practice that is "so permanent and well-settled as to virtually constitute law." <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996). Custom requires proof of knowledge and acquiescence by a decisionmaker

---

[23] Plaintiff cites to Detective Jastrzembski's deposition transcript as evidence of a policy or practice. <u>See</u> ECF 176 at 41 (citing Pl. SOF, ¶¶ 135–36 which references, in part, Detective Jastrzembski's deposition transcript at 44:4–13, 58:23–60:8). However, Plaintiff's pin-cite to the deposition transcript do not relate to a policy or practice of withholding activity sheets.

with the power to make policy.  McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009); see also Est. of Roman, 914 F.3d at 798 (Plaintiff can show an alleged custom proximately caused Plaintiff's injuries by showing the City "had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and that its failure, at least in part, led to [the plaintiff's] injury").  "This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiff's evidence.  Practices so permanent and well settled as to have the force of law [are] ascribable to municipal decisionmakers."  Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citation modified).

Plaintiff sets forth two pieces of evidence that a reasonable jury could conclude in its totality shows a widespread custom of PPD officers suppressing exculpatory evidence.

First, Plaintiff cites Royds' deposition testimony that she believes, though could not recall for certain, that PPD activity sheets were not placed in the homicide binder that was sent to the District Attorney's Office.  Pl. Ex. 16, Royds Dep. Tr. at 78:17–79:24.  Plaintiff also cites the CIU prosecutor's, Arlyn Katen's, deposition testimony that in her review of homicide files she tended to see that handwritten notes were categorically not provided to prosecutors, but she sometimes saw activity sheets provided.  Pl. Ex. 40, Katen Dep. Tr. at 59:13–20.  The City counters with Harris' deposition testimony that, as a matter of practice, he would "provide[ ] activity sheets to the District Attorney's Office[.]"  ECF 167-40, Harris Dep. Tr. at 83:4–84:5.  Standing alone, the deposition testimony is insufficient to create a genuine dispute of fact about a widespread custom.

However, Plaintiff also proffers the expert report of Michael K. Lynch, a purported 33-year career law enforcement professional with experience researching and drafting police department policies and procedures.  Lynch concludes based on his review of extensive materials documenting a history of PPD practices in the 1980s and 1990s and the work of police practices

expert, Dr. R. Paul McCauley, that "[there is] evidence that, if credited, shows that PPD homicide detectives followed a set policy or practice of documenting on activity sheets and in handwritten notes information that would be exculpatory to a criminal defendant and then withholding those activity sheets and handwritten notes from prosecutors and defendants/defense counsel."  Pl. Ex. 39 at 32, 34.  While Plaintiff rests solely on Lynch's conclusion as evidence of a custom, the Court finds it prudent to analyze the materials cited to determine whether there is sufficient evidence of a practice "so widespread as to have the force of law."[24]  Brown, 520 U.S. at 404.

### 1. Evidence of a Custom

Lynch relies on the following materials to reach his conclusion that the PPD had a custom of concealing information from prosecutors and criminal defendants:

- A series published in 1978 by the Philadelphia Inquirer, which, according to Lynch, highlighted detectives in the PPD Homicide Division engaging in fabrication of evidence and suppression and concealment of material evidence, among other improper police practices.  Pl. Ex. 39 at 17.

- Three consent decrees entered by courts addressing unconstitutional PPD practices, notably search and seizure practices.  Id. at 18.

- Press reports that officers operating in PPD's 39th District initiated prosecutions and arrested individuals based on fabricated evidence and concealed exculpatory evidence, including a 1996 litigation that the City settled requiring the PPD to implement policy and training initiatives.  Id.

---

[24] The parties talk over each other on this point.  The City's brief challenges various sources listed in the Second Amended Complaint (on which Mr. Lynch relies on in part) to rebut Plaintiff's evidence of a custom, but Plaintiff relies on those sources not as evidence of a custom, but as evidence of a failure to supervise and/or discipline.  The City does not address this point in reply.  The Court finds that the sources Mr. Lynch relies on is relevant to both custom and to failure to train, discipline, and supervise, and will thus address the arguments here.

- 27 cases of vacated convictions with allegations of various police misconduct. Id. at 24–31.

The City is correct that some of the cases Lynch cites are not facially relevant to establishing a custom specifically at issue in Plaintiff's prosecution—suppression of exculpatory evidence. The Court also did not consider the consent decrees which primarily address illegal searches and seizures, not at issue here. However, on balance, and considering Lynch's other evidence, there is sufficient support for a jury to conclude that the City had a custom or practice of suppressing exculpatory evidence.

The 1978 Philadelphia Inquirer report was "the first link in a chain of evidence suggesting a publicly disclosed pattern of misconduct in the Department that allegedly continued before, during, and after [the early 1990's.]" Thomas v. City of Philadelphia, No. 17-cv-4196, 2019 WL 4039575, at *19 (E.D. Pa. Aug. 27, 2019) (Pratter, J.). Other press reports can establish that the custom persisted through the time of Plaintiff's conviction. See Est. of Roman, 914 F.3d at 799 (holding that plaintiff established a custom of constitutional violations during arrests, in part based on a consent decree that was not yet in effect during plaintiff's arrest). And the cases cited by Mr. Lynch, though some were several years before and after the events in question, can suggest that the custom started before and continued through the time of the Plaintiff's arrest and prosecution for the Haynesworth murder. Thomas, 2019 WL 4039575 at *19 (holding that the 1978 Philadelphia Inquirer series was not too temporally remote to establish a PPD practice in the 1990s in the context of other evidence that the misconduct brought to light in 1978 continued in the 1990s and beyond).

## 2. Causation

A jury could also find that the City's custom of concealing exculpatory evidence caused Plaintiff's injury.[25]  "As long as the causal link between the alleged policy or custom and the constitutional injury is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." A.M. v. Luzerne Cnty. Juv. Det. Ctr., 372 F.3d 572, 581 (3d Cir. 2004) (citation modified).

There is a genuine dispute whether the police turned over five pieces of evidence—including PPD activity sheets and handwritten notes—to the prosecutor.[26]  According to Lynch, the information Plaintiff argues was withheld from the prosecutor, a contention in dispute, showed that James White "(1) took credit for engaging in violent conduct and then changed his story when confronted, (2) provided vastly different accounts as to how murders occurred, and (3) named

---

[25] As the Court explained in footnote 22, the fact that the Court grants summary judgment as to Plaintiff's claim for deliberate suppression does not preclude the jury from finding that Plaintiff was injured by a deliberate suppression of exculpatory evidence.  The basis on which the Court grants summary judgment on the deliberate suppression claim is a lack of personal involvement, not necessarily that there is no evidence of a constitutional violation.  See Mervilus, 73 F.4th at 196–97 ("Where it is possible for the Monell defendant to cause constitutional harm without any individual defendant violating the plaintiff's rights, it is not inconsistent for a jury to find only the Monell defendant liable.") (citing Speer v. City of Wynne, 276 F.3d 980, 985–86 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.")).

[26] Plaintiff cites evidence, albeit somewhat speculative and circumstantial, that these five discovery items were not provided by officers to the prosecutor.  ADA Desiderio testified that he provided defense counsel with every single piece of evidence he received from police, and discovery disclosure letters from a subsequent triple murder trial involving James White as a witness show that the prosecutor did not turn over these five pieces of evidence.  ECF 176 at 39.  Further, none of ADA Desiderio's trial notes reflect that he reviewed these five items.  Id.  Plaintiff also cites the deposition testimony of Jack McMahon, a defense attorney who represented another defendant in a trial in which James White testified, who testified that he would have used every piece of impeachment evidence against White.  Id.  Yet, there is no reference to these five items in the Haynesworth murder trial transcript.  Id.

The Court credits Plaintiff's evidence and holds that it is sufficient at this stage to raise a genuine dispute of material fact whether police suppressed exculpatory evidence from the prosecutor in the Haynesworth murder trial.  The Court views these issues as better suited for resolution at trial where a jury as finders of fact can assess the credibility of Plaintiff's evidence, particularly in light of the significant passage of time since the 1992 trial leading to the absence of direct evidence.

The Court's findings here are not inconsistent with its prior finding as to the Defendant Officers' Motion that no individual Defendant Officer can be liable based on this evidence because there is no showing of personal involvement.

different people as perpetrators, depending on who he was talking to and when he was talking to them." Pl. Ex. 39 at 37. Lynch concludes that this information would have helped defense counsel to impeach James White's testimony and was part of PPD's practice and custom of "conceal[ing] information in large part by documenting exculpatory information on activity sheets and handwritten notes, which [PPD homicide detectives] then withheld from prosecutors and defendants." Id. at 34. Lynch's conclusion is consistent with the CIU prosecutor's testimony that handwritten notes and sometimes activity sheets were documents she tended to see in police files that were not provided to the DA's Office. Pl. Ex. 40, Katen Dep. Tr. 59:13–20.

**B. Evidence of a Failure to Supervise and Discipline**

Plaintiff also raises a § 1983 claim against the City based on a failure to supervise and/or discipline detectives in the homicide division which "allowed detectives to repeatedly engage in misconduct, including the fabrication of evidence, the coercion of witness testimony, and the suppression of exculpatory information." ECF 176 at 50–51. The City argues that Plaintiff fails to provide clear evidence of supervisory or disciplinary deficiencies that caused constitutional violations similar to those Plaintiff alleges here. ECF 168 at 14–18.

A Monell claim predicated on failure to train, supervise, or discipline must establish that the municipality's failure "amounts to [a] deliberate indifference [as] to the rights of persons with whom ... employees will come into contact." Johnson v. City of Phila., 975 F.3d 394, 403 (3d Cir. 2020) (citation modified). "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Forrest, 930 F.3d at 106. Further, to establish a failure to supervise, a plaintiff must identify a specific supervisory practice that the

defendant failed to employ as well as "(1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar conduct, and (2) circumstances under which the supervisor's action could be found to have communicated a message of approval." Langweiler v. Borough of Newtown, No. 10-cv-3210, 2011 WL 1809264, at *5 (E.D. Pa. May 12, 2011) (Baylson, J.) (citing C.H. ex rel. Z.H. v. Olivia, 226 F.3d 198, 202 (3d Cir. 2000) (en banc)).

The Court refers to its prior discussion of the reports underlying Lynch's conclusion as sufficient evidence of a pattern of misconduct in the PPD Homicide Division. In addition, as it pertains specifically to supervision and discipline, Lynch adds that an Integrity and Accountability Officer appointed to monitor compliance and assess the PPD's disciplinary system, concluded that PPD's disciplinary system "remained fundamentally ineffective, inadequate, and unpredictable." Ex. 39 at 19. Dr. McCauley also found systemic deficiencies in the PPD's disciplinary system. Id.

Based on the documented history of misconduct as summarized above extending back to the 1970s, Lynch concludes that "PPD leadership and policymakers were aware of and indifferent to the unlawful conduct of PPD officers." Id. at 20–21. And as it pertains specifically to Plaintiff's case and allegations of misconduct, Lynch concludes that such cases are a consequence of a lack of discipline and the absence of supervision which "set the stage for a series of serious failures and deviations from minimally acceptable police practice that occurred in the Haynesworth investigation," including specific practices of concealing exculpatory evidence. Id. at 33, 36–40.

The City of course is free to rebut the assumptions behind Mr. Lynch's conclusions and to challenge the records he relies on, but that is a matter for trial. The Court finds at this stage that Plaintiff has presented sufficient evidence for a reasonable jury to conclude that the City's failure

to supervise and/or discipline PPD Homicide Division officers amounted to deliberate indifference and caused a deprivation of Plaintiff's constitutional rights.

## VII.   CONCLUSION

For the foregoing reasons, David Desiderio's Motion (ECF 157) is **GRANTED**; Defendants Ansel, Bentham, Cimino, Harris, Hasara, and Royds' Motion (ECF 167) is **GRANTED**; and the City's Motion (ECF 168) is **DENIED**.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 23\23-4077 Coulston v City\23cv4077 memo re summary judgment motions.docx